UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

UNITED STATES OF AMERICA

-v-

FRANCISCO ALBERTO LOPEZ REYES, a/k/a "Frank," and EDWARD EUSTATE JIMENEZ, a/k/a "Chino,"

Defendants.

---------------------------------------------------------------------X

23 Cr. 501 (JPC)

OPINION AND ORDER

JOHN P. CRONAN, United States District Judge

Following a seven-week trial, a jury convicted Defendants Francisco Alberto Lopez Reyes ("Lopez Reyes") and Edward Eustate Jimenez ("Eustate Jimenez") of conspiring to distribute narcotics resulting in death, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), (B), and of substantively distributing narcotics, in violation of 21 U.S.C. §§ 812 and 841(b)(1)(C). The jury also convicted Lopez Reyes of leading a continuous criminal enterprise, in violation of 21 U.S.C. § 848(a), (b), and of conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h).

Invoking Federal Rule of Criminal Procedure 29, Defendants have moved for a judgment of acquittal as to their conspiracy-resulting-in-death convictions and further move for a new trial under Rule 33. Both Defendants challenge the jury's death-resulting finding based on the sufficiency of the evidence and the jury's purported returning of inconsistent verdicts. Lopez Reyes additionally argues that the Court erred by not severing the two Defendants into separate trials. For the reasons that follow, the Court concludes that the trial evidence supported the jury's verdicts and that Defendants are not entitled to a new trial. The Court therefore denies their motions in full.

## I. Facts and Procedural History[1]

On September 30, 2024, the Government filed a superseding indictment charging Lopez Reyes and Eustate Jimenez, as well as several other Defendants, for their alleged roles in distributing narcotics, masked as legitimate prescription medications, which victim-customers purchased on purported online pharmacies operated by the enterprise. Dkt. 58 ("Indictment"). Count One charged Lopez Reyes with leading a continuous criminal enterprise, in violation of 21 U.S.C. § 848(a), (b). *Id.* ¶¶ 93-104. Count Two charged both Lopez Reyes and Eustate Jimenez with conspiring to distribute narcotics resulting in death, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), (B), *id.* ¶¶ 105-108, and Count Three charged them with substantively distributing narcotics resulting in death, in violation of 21 U.S.C. §§ 812 and 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2, *id.* ¶¶ 108-111. Finally, Count Four charged Lopez Reyes with a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). *Id.* ¶¶ 112-14. Trial began on April 20, 2026 with jury selection, and on June 1, 2026, the jury returned guilty verdicts on all Counts. *See* Dkt. 312 ("Verdict Form").[2]

### A. The Pertinent Trial Evidence

#### 1. The Government's Evidence of the Pill-Mill Scheme

At trial, the Government called nearly forty witnesses and presented almost 3,000 exhibits. This evidence painted a clear picture: Lopez Reyes led a vast criminal enterprise, which churned out millions of pills that outwardly appeared to be legitimate prescription medications but in fact

[1] The Court derives the following facts from the testimony and exhibits presented at trial. *United States v. Shannon*, No. 22 Cr. 56 (JPC), 2022 WL 17581558, at *1 n.1 (S.D.N.Y. Dec. 12, 2022); *United States v. Dore*, No. 12 Cr. 45 (RJS), 2013 WL 3965281, at *1 n.1 (S.D.N.Y. July 31, 2013). The trial transcript is cited as "Tr." while "Exh." reflects citations to the exhibits received in evidence at trial.

[2] As discussed below, the jury convicted Defendants of substantively distributing narcotics (Count Three) but did not find that this substantive distribution resulted in death.

were made of dangerous narcotics like fentanyl and methamphetamine. *E.g.*, Tr. at 893-95, 981, 985, 1001, 1007-08, 1041-42, 1094 (testimony of Juan Efren Paulino ("Paulino") discussing the pill-mill scheme and Lopez Reyes's role); *id.* at 1348, 1353-57 (testimony of Dariel Nunez ("Nunez") discussing the same); *id.* at 2019-27 (testimony of Angel Valdez Brito ("Valdez Brito") discussing the same); *id.* at 2366-72 (testimony of Robert Junior Ramos Henriquez ("Ramos Henriquez") discussing the same); Exhs. 17L, 17F, 17K, 23C, 30C (messages between Lopez Reyes and co-conspirators corroborating these witnesses' accounts); Exh. 1007 (spreadsheet summarizing seizure of large quantities of drugs). Using custom molds and dyes, members of this conspiracy disguised these potentially deadly drugs as standard prescription medications like oxycodone, Adderall, and Xanax, which they marketed, sold, and shipped to unsuspecting customers of the enterprise's purported pharmaceutical websites. *E.g.*, Tr. at 926 (Paulino's testimony discussing the pill-mill operations, which manufactured "4,000 to 7,000 pills per hour"); *id.* at 1218-19 (Paulino's testimony discussing counterfeiting of pills, including efforts "to make the pills look real" by "Googl[ing] how they should look"); *id.* at 1361-62 (Nunez's testimony discussing Lopez Reyes's websites); *id.* at 2716-19, 2729, 2732 (testimony of a victim-witness discussing ordering fake Adderall from one of the conspiracy's websites); Exhs. 47F, 47F-17 (Lopez Reyes's messages and a screenshot relating to the conspiracy's websites); Exh. 708A (customer list); Exhs. 902-907, 919-22, 927 (screenshots of the conspiracy's realistic-looking websites with pages for seemingly genuine Xanax, Ativan, oxycodone, and Ambien); Exhs. 929, 932-33 (screenshots from one of the conspiracy's websites with pages for hydrocodone and round, blue oxycodone pills stamped "M" and "30").

To distribute these counterfeit drugs, Lopez Reyes relied on several co-conspirators to send the fake pills through the mail. *See* Tr. at 893, 1042, 1058-61 (Paulino's testimony discussing

various individuals who shipped drugs for Lopez Reyes, including Nunez); *id.* at 1348, 1353-55, 1357, 1380 (Nunez's testimony discussing his role "pick[ing] up pills and shipp[ing] pills" for Lopez Reyes via the United States Postal Service ("USPS")); *id.* at 2014-29, 2037 (Valdez Brito's testimony discussing the same); Exhs. 5D, 17F, 17K, 17L, 24B-1, 30C, 47I-3 (messages between Lopez Reyes and his co-conspirators discussing operations and shipping addresses). One of these shippers was Eustate Jimenez, who reported to Lopez Reyes and supervised several other individuals—including two lower-level co-conspirators, Ramos Henriquez and Marvin Polanco ("Polanco"). Tr. at 893 (Paulino's testimony discussing Eustate Jimenez's role shipping pills for Lopez Reyes); *id.* at 2291, 2366-72 (Ramos Henriquez's testimony discussing the shipment of pills and describing Polanco's and Eustate Jimenez's roles); Exhs. 23C, 24B-1 (messages between Eustate Jimenez and Lopez Reyes regarding shipments); Exhs. 811, 817, 826, 857 (photos of Eustate Jimenez sending shipments). At trial, the Government asserted that Eustate Jimenez's team shipped fentanyl pills that resulted in the death of a woman named Holly Holderbaum.

**2. The Government's Evidence that Holly Holderbaum's Death Resulted from the Conspiracy**

The Government presented a chain of evidence, including text messages, photographs, and witness testimony, to show that Holderbaum died as a result of ingesting pills shipped as part of Defendants' conspiracy. Screenshots from Holderbaum's phone showed that on February 13, 2024, she ordered "oxyxodone [sic]" (a painkiller) from one of Lopez Reyes's purported online pharmacies. Exhs. 1009, 73D; *see also* Exh. 903 (screenshot from that purported pharmacy's website advertising oxycodone as among its "Top Rated Products"). A few days later, on February 16, 2024, Lopez Reyes sent Eustate Jimenez a series of WhatsApp messages with several names, addresses, and descriptions of pills; one such item read "Holly Holderbaum . . . oxy M30" and listed an address for Holderbaum. Exhs. 24B-1 at 25, 24B-2A. Within the hour, Eustate Jimenez

forwarded this order (and several others) to Ramos Henriquez, along with the "prayer" or "thank you" emoji. Exhs. 23D at 122, 23D-286. Ramos Henriquez then began packing up various pills and placing them in envelopes, and he eventually asked Polanco for help. Tr. at 2402-03, 2407-08. Meanwhile, Eustate Jimenez shared a voice memo with Polanco saying "that shit has to go out today." Exhs. 23E at 2, 23E-10, 23E10-T.

Polanco subsequently sent Ramos Henriquez a photo displaying a plastic bag with fake 30-milligram oxycodone pills—round, blue, and stamped with the letter "M" and the number "30"—on top of an envelope addressed to Holderbaum. Tr. at 2443-45; Exhs. 24A at 15, 24A-29. Ramos Henriquez then passed along that photograph to Eustate Jimenez because, as Ramos Henriquez testified, Lopez Reyes "always asked for the photo to be forwarded." Tr. at 2445. In the meantime, Polanco mailed the package to Holderbaum. *See* Exh. 802 (USPS scan of package with Holderbaum's name and address); Exh. 804 (surveillance photograph of Polanco at post office). Polanco then sent Eustate Jimenez a shipping receipt for the package. Exhs. 23E at 3, 23E-15.

USPS dropped the package off at Holderbaum's address on February 20, 2024, at 4:27 p.m. *See* Exh. 801 (USPS shipping records). Fewer than twenty minutes later, Holderbaum ran web searches for "pill identifier" and navigated to a website entitled "M 30 Blue and Round Pill Images – Pill Identifier – Drugs.com." *See* Exh. 1009 at 6. A few days later, Holderbaum texted a friend saying that her back was hurting, *id.*, and she complained to her mother about such pain around the same time, Tr. at 90. On February 25, five days after Holderbaum received the shipment, her mother discovered her lying in her bed, unresponsive. *Id.* at 92-93. Soon later, emergency responders declared Holderbaum dead. *Id.* at 94.

Dr. Louis Finelli—a forensic pathologist in the Delaware Division of Forensic Science—subsequently autopsied Holderbaum's body, running a suite of toxicological and viral studies. *Id.*

at 1714-15, 1722. Finelli concluded that Holderbaum had died of "acute fentanyl intoxication" because her bloodstream included both fentanyl and its metabolite (fluorofentanyl) at "above a lethal level." *Id.* at 1721-23; Exh. 201. Dr. Finelli also observed that Holderbaum's lungs contained fluid build-up, that her brain was swollen, and that her bladder contained high amounts of urine—all telltale signs of fentanyl poisoning. Tr. at 1726-27.

Additional analysis of Holderbaum's blood supported the same conclusion. Professor Jessica Smith, Delaware's Chief Forensic Toxicologist, examined Holderbaum's drug test results and concluded that they showed fentanyl and fluorofentanyl in Holderbaum's blood. Tr. at 1689; Exh. 1006. Professor Smith noted that she had followed a "conservative approach" in preparing her report, deciding not to formally distinguish between different fentanyl isomers—*i.e.*, para, ortho, and metafentanyl—and instead to simply report fluorofentanyl generally. Tr. at 1680, 1690. But Professor Smith also specifically checked Holderbaum's blood chromatograms for para-fluorofentanyl, and she concluded that the blood contained that isomer. *Id.* at 1690-93; Exh. 1006 at 8. Meanwhile, Dr. Michael Smith, the Scientific Director of Clinical and Forensic Toxicology at Quest Diagnostics in Chantilly, Virginia, also analyzed the test results and confirmed Professor Smith's findings. Tr. at 2671.

Forensic toxicologists did not just examine Holderbaum's blood—they also scrutinized the contents of her room. When Holderbaum died, there was a pill bottle labeled "mirtazapine" sitting on her nightstand. *Id.* at 161-62; Exhs. 1105, D-186C. Although law enforcement did not initially take and test the contents of this bottle, they decided to inspect it roughly six months later, on August 27, 2024. Tr. at 242-248, 254.[3]

---

[3] Holderbaum's mother testified that she did not alter her daughter's room after her death and that she left all of the pill bottles and medications in place. Tr. at 95.

This testing of the contents of that bottle revealed two relevant facts. First, the bottle contained forty-six round, blue pills, stamped with an "M" on one side and a "30" on the other. *Id.* at 246-47, 1817-18; Exh. 1921. Second, these pills contained fentanyl and para-fluorofentanyl. Tr. at 1811, 1815-18; Exh. D-186A. Dr. Russell Gallis, a senior forensic chemist at the United States Drug Enforcement Administration, examined a sample of the pills. Tr. at 1815. The first round of testing confirmed that the pills included fentanyl, and "indicated" the presence of para-fluorofentanyl—suggesting (without conclusively determining) that the sample contained that isomer. *Id.* at 1818-20, 1863. Dr. Gallis then conducted a second round of testing, adding six additional units to the sample. *Id.* at 1821. This second test conclusively identified para-fluorofentanyl, and Dr. Gallis therefore had "complete confidence" that the blue pills in the bottle included that substance. *Id.* at 1863. Furthermore, law enforcement recovered no other blue pills or pills containing fentanyl in Holderbaum's room. *Id.* at 248, 2694.

**3. Relevant Procedural History**

On March 13, 2026, about five weeks before trial began, Lopez Reyes moved for severance under Federal Rule of Criminal Procedure 14(a) on the ground that the two Defendants might present mutually antagonistic defenses. Dkt. 261. As Lopez Reyes elaborated at a final pretrial conference on April 10, 2026, the question of "who was occupying what role in this particular conspiracy" would come up at trial, and Defendants might "argu[e]" about which "specific role[s]" each of them had held. Dkt. 418-1 at 11-14. The Court denied the motion to sever, finding "no basis" to conclude that Defendants' interests were so opposed that they could not be tried together. *Id.* at 78.

Trial began on April 20, 2026. Tr. at 1. On May 21, 2026, the Government finished presenting its case, and Defendants moved for judgments of acquittal under Federal Rule of

Criminal Procedure 29. *Id.* at 2991-99. The Court denied Defendants' motions from the bench, ruling that the Government had presented sufficient evidence for the jury to find them guilty on each Count for which they were charged. *Id.* at 2999-3011. Defendants then declined to call any witnesses. *Id.* at 3020. Closing arguments took place on May 26 and 28. *Id.* at 3081-3247, 3271-3387. Late in the afternoon on May 28, after receiving instructions on the law, *id.* at 3389-3468, the jury began deliberating. *Id.* at 3473.

On June 1, 2026, the jury returned guilty verdicts on all Counts. *See* Verdict Form. With respect to Counts Two and Three, the jury also considered whether Defendants' crimes had resulted in Holderbaum's death. As for Count Two—conspiracy to distribute narcotics—the jury found (in Questions 8 and 10 on the Verdict Form) that "the use of fentanyl and/or para-fluorofentanyl distributed by members of the conspiracy joined by [Defendants] result[ed] in the death of Holly Holderbaum." Verdict Form at 4, 6. But on Count Three, the substantive charge of distributing narcotics, the jury rejected the death-resulting enhancement. *Id.* at 7. Specifically, it found (in Questions 13 and 14) that "the use of fentanyl and/or para-fluorofentanyl that Francisco Lopez Reyes [and Edward Eustate Jimenez] distributed, possessed with intent to distribute, or aided and abetted the same" did not result in Holderbaum's death. *Id.* at 7.

After receiving the jury's verdict, the Court re-read Questions 8 and 10, and the foreperson confirmed that the jury had found the death-resulting enhancement with respect to the conspiracy charge in Count Two. Tr. at 3494-98. The Court then re-read Questions 13 and 14, and the foreperson verified that the jury had *not* found that enhancement with respect to the substantive charge in Count Three. *Id.* at 3498-99. The Court then asked if counsel wanted to poll the jury, and counsel for Lopez Reyes replied that he would. *Id.* at 3499. After each juror confirmed that the foreperson had stated the correct verdict, the Court asked, "Counsel, at this time, is there any

reason not to discharge the jury?" *Id.* at 3499-3500. Both of Defendants' counsel responded, "No, your Honor. Thank you." *Id.* at 3500. The Court then relieved the jury. *Id.* at 3500-02.

On August 3, 2026, Lopez Reyes moved for a judgment of acquittal under Rule 29 or for a new trial under Rule 33. Dkt. 364 ("Lopez Reyes Motion"). On August 4, 2026, Eustate Jimenez filed a similar motion. Dkt. 365 ("Eustate Jimenez Motion"). On September 8, 2026, the Government opposed both motions. Dkt. 384.

## II. Legal Standard

Federal Rule of Criminal Procedure 29 requires courts to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient only if it is so "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021) (internal quotation marks omitted).

In determining whether a reasonable jury could convict, courts "must be careful to avoid usurping [the jury's] role." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). Courts therefore must "credit[] every inference that could have been drawn in the government's favor and view[] the evidence in the light most favorable to the prosecution," *Capers*, 20 F.4th at 113 (internal quotation marks and brackets omitted), and they must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence," *Jackson*, 335 F.3d at 180. Furthermore, these maxims become "especially important when reviewing a conviction for conspiracy because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *Id.* (internal quotation marks and ellipsis omitted).

Rule 33 sets a similarly high bar. That Rule generally permits courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). But this standard demands a new trial only if the judge "harbor[s] a real concern that an innocent person may have been convicted," such that "it would be a manifest injustice to let the guilty verdict stand." *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007) (internal quotation marks omitted). This test is "strict": the Second Circuit has cautioned district courts that "motions for a new trial are disfavored," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and that they should accordingly "exercise the[ir] Rule 33 authority [only] sparingly and in the most extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).

**III. Discussion**

Defendants advance three main arguments. First, they contend that the Government did not present sufficient proof to allow the jury to find beyond a reasonable doubt that the drugs distributed as part of the conspiracy caused Holderbaum's death. *See* Lopez Reyes Motion at 13-19; Eustate Jimenez Motion at 6-10, 12-13. Second, they insist that the jury returned internally inconsistent verdicts because it convicted them of conspiring to distribute narcotics resulting in Holderbaum's death, but not of substantively distributing the drugs that caused her death. *See* Lopez Reyes Motion at 6-13; Eustate Jimenez Motion at 11, 13-14. Finally, Lopez Reyes maintains that the Court should have severed the proceedings against the two Defendants into separate trials. *See* Lopez Reyes Motion at 19-23. For the reasons below, Defendants' arguments fail on every front.[4]

[4] Defendants join each other's arguments "to the extent that such arguments are applicable and not adverse" to their respective positions. Lopez Reyes Motion at 23; Eustate Jimenez Motion at 14.

### A. The Government Presented Sufficient Evidence that the Drugs Defendants Conspired to Distribute Caused Holly Holderbaum's Death.

Defendants contend that the Government did not show that the drugs that they conspired to distribute "were the but-for cause of Holly Holderbaum's death." Eustate Jimenez Motion at 6. Defendants' arguments boil down to two basic factual challenges: (i) Holderbaum may not have taken the pills that their operation sold her and (ii) even if she did, those drugs may not have resulted in her death. *See id.* at 6-7; Lopez Reyes Motion at 13. The evidence, however, suggests otherwise, and a reasonable jury could easily have concluded that the drugs Defendants conspired to distribute killed Holderbaum.

The evidence at trial told a straightforward story. As laid out above, screenshots from Holderbaum's phone, messages exchanged by the conspirators, voluminous witness testimony, photographs, USPS records, and extensive scientific testing revealed that (i) Holderbaum ordered blue, round pills that were advertised as oxycodone from Lopez Reyes's website; (ii) Lopez Reyes and Eustate Jimenez arranged for those pills to be shipped to Holderbaum (with help from two lower-level co-conspirators, Ramos Henriquez and Polanco); (iii) Holderbaum received those pills; (iv) Holderbaum died a few days later; (v) identical round, blue pills, with "M" stamped on one side and "30" on the other, were discovered on Holderbaum's nightstand next to her deathbed; (vi) those pills contained fentanyl and para-fluorofentanyl (and no other medications in Holderbaum's room did); (vii) Holderbaum's body contained the same substances; and (viii) Holderbaum died of fentanyl intoxication. *See supra* I.A.2. The evidence thus painted a clear picture: Defendants conspired to send Holderbaum blue pills with fentanyl and para-fluorofentanyl, she ingested those pills, and she died of fentanyl poisoning.

Defendants' attempts to blur this image are unavailing. First, they suggest that the blue pills found in the bottle may not have been those that were "distributed in this conspiracy." Lopez

Reyes Motion at 18; *see* Eustate Jimenez Motion at 9-10. Defendants point out that the pills were in a "pill bottle," not a bag, Lopez Reyes Motion at 19; Eustate Jimenez Motion at 7, that Ramos Henriquez never identified the pills in the bottle as those that he shipped, Lopez Reyes Motion at 18; *see* Eustate Jimenez Motion at 9-10, and that "there was nothing distinguishable about the blue pills" because round, blue pills are common, Lopez Reyes Motion at 18.[5] But the jury could easily have inferred that Holderbaum moved the pills to a bottle designed for storing pills, instead of keeping them in a plastic bag. And—however common round, blue pills stamped with the letter "M" and the number "30" might be—the blue pills on Holderbaum's nightstand indisputably resembled those that Defendants' co-conspirators had shipped a few days before, and none of the evidence suggested that Holderbaum had received similar pills from any other source. In any event, it was not unreasonable or manifestly unjust for the jury to conclude that Holderbaum did not, in fact, coincidentally happen to obtain identical round, blue pills disguised as oxycodone—but in fact also containing fentanyl—from another unidentified party at the exact same time as she received that precise (and unusual) product from Defendants' co-conspirators.[6]

Second, Defendants imply that even if they did conspire to send the pills in the bottle, those pills may not have killed Holderbaum. They begin by suggesting that the blue pills recovered in Holderbaum's room did not actually contain para-fluorofentanyl because the Government's

[5] Defendants' second and third arguments appear to have some tension with each other. If the pills were too generic for their visual appearance to reveal their provenance, then it is not clear how Ramos Henriquez could have been expected to identify them with any degree of certainty.

[6] Lopez Reyes also notes that several months separated Holderbaum's death from law enforcement's decision to take and test the pills, and he implies that Holderbaum's room was in some way "staged" during that gap. Lopez Reyes Motion at 19 (internal quotation marks omitted). But Lopez Reyes cites no persuasive evidence to support this speculative argument, and Holderbaum's mother—whom the jury was entitled to credit, *see United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010)—testified that she left Holderbaum's room untouched after her daughter's death, Tr. at 95.

expert—Dr. Gallis, a forensic chemist—tested the pills twice, and the first test "**did not indicate** the presence of para fluorofentanyl." Lopez Reyes Motion at 14; *see* Eustate Jimenez Motion at 8. But that argument misinterprets the evidence. Dr. Gallis's first test clearly demonstrated that the pills contained fentanyl and "indicated" that they probably also contained para-fluorofentanyl; his second round of testing, which involved a larger sample, then conclusively confirmed that the blue pills contained para-fluorofentanyl. Tr. at 1819-21. Indeed, Dr. Gallis testified that he had "complete confidence" that the pills contained that substance. *Id.* at 1863.[7]

Finally, Defendants contend that Holderbaum's blood may have included some *other* isomer of fentanyl—meaning that any para-fluorofentanyl in their pills did not kill her—because the "toxicology report" did not "specifically report para-fluorofentanyl." Eustate Jimenez Motion at 8; *accord* Lopez Reyes Motion at 15-16. But while Professor Jessica Smith explained that her laboratory's report did not precisely distinguish between fentanyl isomers, Tr. at 1680, she also testified that she had examined chromatograms of the results, and that it was her "strong belief" that Holderbaum's blood contained para-fluorofentanyl, *id.* at 1692. *See supra* I.A.2. And the Government's other expert, Dr. Michael Smith concurred. Tr. at 2671. In short, the jury could reasonably have inferred that para-fluorofentanyl had contaminated Holderbaum's bloodstream based on the facts that her body contained *a* fentanyl isomer, that law enforcement had discovered

[7] Lopez Reyes implies that it was irregular for Dr. Gallis to test the pills a second time because he was initially "satisfied with the results of [his] first" examination. Lopez Reyes Motion at 14. But a forensic chemist's decision to follow up, and use a larger sample in the subsequent testing, so as to conclusively confirm the results "indicated" by a preliminary test, hardly suggests irregularity. If anything, it reflects the kind of rigor appropriate and expected to prove guilt in a criminal case.

pills with para-fluorofentanyl on her bedside table, and that multiple toxicologists thought that the isomer in her blood was para-fluorofentanyl.[8]

Fundamentally, Defendants' arguments all suffer from the same flaw. They present theories that might (or might not) sway a jury, but that cannot bear the weight of a post-verdict motion. A defendant moving under Rule 29 must do more than show that "inferences consistent with innocence as well as with guilt might be drawn from circumstantial evidence," *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (internal quotation marks omitted), or that the Government has "not exclude[d] every possible hypothesis of innocence," *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (internal quotation marks omitted); rather, he must carry the "heavy burden" of showing that *no* "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Capers*, 20 F.4th 105 at 113 (internal quotation marks omitted). *See Jackson*, 335 F.3d at 180 ("[I]t is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence."). Meanwhile, a Rule 33 motion will succeed only if the defendant shows that "it would be a manifest injustice to let the guilty verdict stand." *Guang*, 511 F.3d at 119 (internal quotation marks omitted). Under these standards, Defendants' speculative counterfactuals fall flat. The Court may not "usurp[] the role of the jury" by vacating its verdicts. *Jackson*, 335 F.3d at 180.

[8] Defendants also argue unconvincingly that the "para fluorofentanyl contained within Ms. Holderbaum's body" may not have "matched the para fluorofentanyl" contained within the pills they shipped. Lopez Reyes Motion at 15; *see* Eustate Jimenez Motion at 8. The jury, however, could reasonably have decided that the para-fluorofentanyl found in Holderbaum's body came from the pills containing para-fluorofentanyl that law enforcement found on her nightside table—without any additional level of (potentially unattainable) toxicological precision.

**B. Defendants Are Not Entitled to Relief Based on the Jury's Purportedly Inconsistent Verdicts.**

Defendants next argue that the jury returned inconsistent verdicts, which will work a "manifest injustice . . . if allowed to stand." Lopez Reyes Motion at 8. Defendants insist that the verdicts on Counts Two and Three had a "literal[ly] impossible result," because they could not have been acquitted of "substantively committing a crime while simultaneously being found guilty of agreeing to commit [that] crime." *Id.* at 8. This argument is flawed for two independent reasons.[9]

First, the jury's verdict was not inconsistent. *See United States v. Pierce*, 940 F.3d 817, 821 (2d Cir. 2019) ("It is the duty of the court to attempt to harmonize [a jury's special interrogatory] answers, if it is possible under a fair reading of them." (internal quotation marks and brackets omitted)). On Count Two, the jury found that "the use of fentanyl and/or para-fluorofentanyl *distributed by members of the conspiracy* joined by [Defendants] result[ed] in the death of Holly Holderbaum." Verdict Form at 4, 6 (emphasis added). Meanwhile, on Count Three, the jury found that "the use of fentanyl and/or para-fluorofentanyl *that Francisco Lopez Reyes [and Edward Eustate Jimenez] distributed*, possessed with intent to distribute, or aided and abetted the same" did not "result in the death of Holly Holderbaum." *Id.* at 7 (emphasis added). These findings were entirely plausible and consistent—the jury could have concluded that the

[9] There is also a possible third flaw: Defendants never objected to the jury's verdict when given the opportunity to do so. Tr. at 3500 (after receiving the jury's verdicts, the Court asking, "Counsel, at this time, is there any reason not to discharge the jury?", and both defense counsel responding, "No, your Honor. Thank you."). That failure alone may doom Defendants' arguments. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 46 (2d Cir. 2015) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." (internal quotation marks omitted)) (discussing civil jury). However, given the enormous stakes for both Defendants, the Court considers Defendants' challenges in full.

Government did not present sufficient proof that Defendants *personally* distributed the drugs that killed Holderbaum, or aided and abetted the distribution of those drugs, but that they did participate in the conspiracy that sent those drugs to her.[10]

Defendants nevertheless resist this straightforward distinction. They began by claiming that the interrogatories conflict because "the only question" that they really posed was "whether ***that drug***"—*i.e.*, the particular pills of fentanyl distributed—resulted in Holderbaum's death, and that the same pills could not have both killed Holderbaum and not killed her. Lopez Reyes Motion at 10. But that argument oversimplifies the plain language of the interrogatories, which clearly focused not just on the *identity* of the drug but also on its *source*. The earlier interrogatories for Count Two asked whether fentanyl and/or para-fluorofentanyl "distributed by members of the conspiracy" resulted in Holderbaum's death, while the later ones for Count Three asked whether fentanyl and/or para-fluorofentanyl distributed personally by Lopez Reyes or Eustate Jimenez (or whose distribution Lopez Reyez or Eustate Jimenez aided and abetted) did the same. Verdict Form at 4-7. The jury thus could have reasonably concluded that Defendants' co-conspirators distributed the fentanyl that caused Holderbaum's death, but that Defendants themselves neither (personally) did so, nor aided and abetted doing so.

Defendants also note that the substantive interrogatories referred to aiding-and-abetting liability, which is "rather similar to conspiratorial liability." Lopez Reyes Motion at 11 n.5. But it is hardly a "literal[ly] impossible result" for a jury to convict Defendants on one theory, while acquitting them on a "rather similar" theory. *Contra id.* at 8, 11. And Defendants' one-sentence argument (contained in a footnote) does not spell out any relevant overlap between these two forms

[10] Indeed, Lopez Reyes concedes that "[t]here clearly is a distinction between a conspiracy charge and a substantive charge." Lopez Reyes Motion at 8.

of liability, which—after all—diverge. *See United States v. Schwartz*, 548 F.2d 427, 430 (2d Cir. 1977) (rejecting the defendant's argument that a "guilty verdict of aiding and abetting" and an "acquittal on a conspiracy count" were "inconsistent" and explaining that trial judge rightly "distinguish[ed] the two concepts").

In any event, "even if [Defendants] could establish that the verdicts were mutually irreconcilable, [their] argument would fail." *United States v. Martinez*, 110 F.4th 160, 172 (2d Cir. 2024). As the Supreme Court explained in *United States v. Powell*, 469 U.S. 57 (1984), "a criminal defendant convicted by a jury on one count [cannot] attack that conviction because it was inconsistent with the jury's verdict of acquittal on another count," *id.* at 58. That rule rests on a solid rationale: because courts cannot "peer inside the jury's deliberations," they have no way of "infer[ring] *why* a jury has returned a mixed verdict," which may rest on "impermissible reasons, such as mistake, compromise, or lenity." *Martinez*, 110 F.4th at 173 (internal quotation marks omitted and emphasis added). For this reason, rather than speculating about how a jury reached such a result—and guessing "whether it was the acquittals or the convictions that were erroneously returned," *id.*—courts simply refuse to "review . . . verdict[s] for inconsistency," *United States v. Moran-Toala*, 726 F.3d 334, 342 (2d Cir. 2013). Furthermore, the principle that "consistency in the verdict is not necessary," *id.* (quoting *Dunn v. United States,* 284 U.S. 390, 393 (1932) (Holmes, J.)) (brackets omitted), applies both to minor tensions and to direct contradictions that it would be "hopeless to try to reconcile," *id.* at 341.

Lopez Reyes responds to this long-tenured caselaw by presenting a multitude of unconvincing arguments. First, he contends that there is an exception to the *Powell* doctrine when a verdict is "metaphysically impossible." Lopez Reyes Motion at 12. But while it is true that the Second Circuit once affirmed the vacatur of a conviction on this basis, the Circuit made clear that

the metaphysical-impossibility exception does *not* permit challenges to "logically incongruous" verdicts marred by typical inter-count inconsistencies. *Pierce*, 940 F.3d at 823 (internal quotation marks omitted); *accord Powell*, 469 U.S. at 65 (explaining that a jury may "acquit on a predicate offense while convicting on the compound offense"). Instead, a problem arises only when a *single* count is flawed by *intra*-count discrepancies, such as when "a jury [finds] a defendant guilty of a count charging a conspiracy to distribute three narcotics and also answer[s] 'no' to interrogatories asking whether the defendant conspired to distribute each narcotic listed in that count." *Pierce*, 940 F.3d at 822. And the verdicts here are plagued by no such internally contradictory, grammatically senseless finding on a count; at worst, the verdicts display garden-variety differences spread across two counts—exactly the kind of deviation that *Powell* anticipated.

Defendants also briefly suggest in a footnote that an inconsistency between "interrogator[ies] . . . is distinguishable from an inconsistency between counts." Lopez Reyes Motion at 12 n.6. But Defendants do not explain *why* that would be. And in any event, *Powell*'s rationale applies just as much to interrogatories, which can trigger statutory enhancements and harsher penalties, as it does to overarching counts. *Powell*, 469 U.S. at 65 (emphasizing that courts may not set aside incompatible verdicts because juries may reach "inconsistent conclusion[s]" through "mistake, compromise, or lenity").

Lopez Reyes then asks the Court to order a new trial under Rule 33 because "these particular inconsistencies are so severe that they amount to legal impossibilities, cause a stain on the appearance of justice and deny Mr. Lopez Reyes fundamental fairness." Lopez Reyes Motion at 12. The Court declines this invitation to circumvent *Powell*. Most fundamentally, as noted, the Court sees no inconsistency in the verdicts, let alone such a shocking inconsistency as to suggest that "an innocent person may have been convicted" and that "it would be a manifest injustice to

let the guilty verdict stand." *Guang*, 511 F.3d at 119 (internal quotation marks omitted). But even if there were an inconsistency, as also discussed above, the Supreme Court in *Powell* explained why inconsistent verdicts do not suggest injustice; indeed, it is "equally possible that the jury [here], convinced of guilt, properly reached its conclusion on the [first set of interrogatories], and then through mistake, compromise, or lenity arrived at an inconsistent conclusion on the [second]," in which case the inconsistency landed in Lopez Reyes's favor. *Powell*, 469 U.S. at 65.

Eustate Jimenez makes one remaining argument, which takes a more modest approach but still falls short. Eustate Jimenez concedes that a jury's "differing findings do not themselves require reversal," Eustate Jimenez Motion at 13, but insists that the verdict's alleged contradictions "reinforce" the "evidentiary deficiencies" that he identified in his sufficiency-of-the-evidence argument, *id.* at 11, 13-14; *see supra* III.A. That contention, however, runs headlong into binding precedent: as the Second Circuit and the Supreme Court have explained, courts must "look only to the evidence presented to the jury, not to its verdicts on other counts, when assessing the factual sufficiency of a conviction." *Martinez*, 110 F.4th at 173; *accord Powell*, 469 U.S. at 67 (same).

**C. Lopez Reyes Was Not Entitled to a Separate Trial.**

Finally, Lopez Reyes argues that the Court erred by not splitting up Defendants into separate trials because he and Eustate Jimenez presented "mutually antagonistic defenses," resulting in prejudice that "wholly outweighed any judicial economy gained from a joint trial." Lopez Reyes Motion at 23. Lopez Reyes maintains that his defense relied on downplaying "his own role in the conspiracy," and that Eustate Jimenez's counsel thus harmed him during closing arguments by suggesting that Lopez Reyes led and supervised the scheme. *Id.* at 21-22.

"Rule 14 of the Federal Rules of Criminal Procedure permits a district court to 'grant a severance of defendants' if 'it appears that a defendant is prejudiced by a joinder of defendants for

trial together.'" *United States v. Yousef*, 327 F.3d 56, 149 (2d Cir. 2003) (quoting Fed. R. Crim. P. 14(a)) (ellipses omitted). But a court must hesitate before severing a case; after all, "[j]oint trials play a vital role in the criminal justice system" by "promot[ing] efficiency and serv[ing] the interests of justice"—which might otherwise suffer "the scandal and inequity of inconsistent verdicts"—and there is thus "a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotation marks omitted). Furthermore, "[t]his preference is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).

This strong wind pushing courts toward joinder correspondingly increases the level of prejudice that defendants must demonstrate to sever their trials. "[T]o prevail" on a Rule 14 motion, "the defendant must show not simply some prejudice but *substantial* prejudice." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (internal quotation marks omitted). "[S]ome adverse effect" is thus not enough. *Id.* Nor is "[m]ere antagonism between the defenses" of the co-defendants. *United States v. Serpoosh*, 919 F.2d 835, 837 (2d Cir. 1990). Rather, the defendant seeking severance must show prejudice so extreme that it risks "prevent[ing] the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see also Yousef*, 327 F.3d at 150 (explaining that a district court's denial of a Rule 14 motion is "virtually unreviewable and will be overturned only if a defendant can show prejudice so severe that his conviction constituted a miscarriage of justice" (internal quotation marks omitted)).

Lopez Reyes has not made that showing here. Instead, he merely points to a handful of comments made by Eustate Jimenez's counsel during closing arguments, suggesting that Lopez Reyes played a major role in the conspiracy (as compared to Eustate Jimenez's minor one). *See*

Lopez Reyes Motion at 22 (quoting Tr. at 3330 (explaining that Lopez Reyes "was managing the managers")). But "[t]he mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance." *Serpoosh*, 919 F.2d at 837 (internal quotation marks omitted); *accord United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) ("Mere fingerpointing does not require severance." (internal quotation marks omitted)); *see also Zafiro*, 506 U.S. at 538 ("Mutually antagonistic defenses are not prejudicial *per se*."). And Lopez Reyes and Eustate Jimenez (i) articulated similar overarching arguments focused on the Government's burden of proof, *e.g.*, Tr. at 77 (Eustate Jimenez's counsel stating in his opening statement that "our clients are pleading not guilty because they are not guilty of the charges as the [G]overnment is charging them"); (ii) filed various joint mid-trial submissions, Dkts. 292, 300, 305; and (iii) spent much of their closing arguments attempting to undermine the Government's witnesses and poke holes in the chain of causation leading to Holderbaum's death, *e.g.*, Tr. at 3168-69 (Lopez Reyes's closing argument); *id.* at 3310, 3330 (Eustate Jimenez's closing argument). Indeed, even in *this* round of briefing, Defendants glom onto each other's arguments. *See* Lopez Reyes Motion at 23 (asking to join "arguments of cocounsel to the extent that such arguments are applicable and not adverse to him"); Eustate Jimenez Motion at 14 (same).

In any event, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39. One such way to tailor relief is through "limiting instructions," which "often will suffice to cure any risk of prejudice." *Id.* at 539. Here, Lopez Reyes did not request such an instruction; but the Court nonetheless told the jury that "[t]he statements and arguments made by the lawyers are not evidence," and that the jury's "recollection of the evidence [would] govern[], not the statements of the lawyers." Tr. at 3395. Those instructions cured any potential

prejudice by emphasizing that only the trial evidence may be considered in evaluating the proof of Lopez Reyes's guilt. In other words, the purportedly problematic closing statement did not unduly harm Lopez Reyes because it carried no evidentiary weight, and the jury was aware of that fact because the Court expressly told it so.

Staring down these problems, Lopez Reyes fires off two last-ditch arguments. First, he points to *United States v. Tootick*, 952 F.2d 1078 (9th Cir. 1991), a case in which the Ninth Circuit ordered severance. Lopez Reyes Motion at 19-20. But *Tootick* is easily distinguishable. There, "the principle [sic] defense of each defendant was that the other alone committed the assault[]" with which they had both been charged. 952 F.2d at 1081. Indeed, one defendant went so far as to *testify* against the other, saying that he "watched in horror" as his codefendant unexpectedly stabbed an acquaintance. *Id.* Here, by contrast, the codefendants did not testify against each other—on the contrary, they signed off on each other's briefs. And rather than involving a single, disputed act, this case involves a vast criminal conspiracy, with the Government offering proof of both Defendants' participation in that conspiracy. A wide gap thus separates the zero-sum situation in *Tootick*—where the defense theories directly "contradicted [each] other in such a way that the acquittal of one [defendant] necessitate[d] the conviction of the other," *id*—from this case, where some slight tension cropped up during closing arguments.

Second, Lopez Reyes asserts that Eustate Jimenez's counsel spoke last, and that "[t]his timing clearly prevented [him] from being able to counter the extremely prejudicial arguments of co-counsel." Lopez Reyes Motion at 22. But, as discussed above, these arguments were *not* "extremely prejudicial"—especially when considered in the context of the entire multi-week trial. Furthermore, Lopez Reyes's counsel opted to deliver his closing statement before Eustate Jimenez's counsel, Tr. at 3167, even though he was aware of the potential for prejudice as reflected

by his pre-trial motion to sever, *see* Dkt. 261. *Cf. United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) ("A finding of true waiver applies . . . [when] defendants not only failed to object to what they now describe as error, but they actively solicited it.").[11]

In sum, Lopez Reyes has not shown such drastic prejudice that the Court must overlook both the law's "preference . . . for joint trials," *Zafiro*, 506 U.S. at 537 (internal quotation marks omitted), and its antipathy to new ones, *Gambino*, 59 F.3d at 364 ("[M]otions for a new trial are disfavored."). Because the Court is certain that joinder did not "prevent the jury from making a reliable judgment about guilt or innocence," *Zafiro*, 506 U.S. at 539—and that Lopez Reyes is not facing "manifest injustice," *Guang*, 511 F.3d at 119 (internal quotation marks omitted)—it denies Lopez Reyes's new-trial motion based on the failure to sever.

## IV. Conclusion

For the foregoing reasons, Defendants' post-trial motions are denied. The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 364 and 365.

SO ORDERED.

Dated: October 22, 2026
New York, New York

JOHN P. CRONAN
United States District Judge

[11] Lopez Reyes also did not object, request a sidebar, or call for an adjournment during Eustate Jimenez's closing argument.